Judgment reversed<br>and cause remanded.

DOAN, P.J., and HENDON, J., concur.

—————————

The STATE of Ohio, Appellee,

v.

Randolph WILKINS, Appellant.

[Cite as *State v. Wilkins*, 163 Ohio App.3d 576, 2005-Ohio-5193.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22493.

Decided Sept. 30, 2005.

David H. Bodiker, State Public Defender, and John A. Bay, Assistant Public Defender, for appellant.

Sherri Bevan Walsh, Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

SLABY, Presiding Judge.

{¶ 1} Defendant, Randolph Wilkins, appeals from a judgment by the Summit County Court of Common Pleas that denied his application for DNA testing. We affirm.

{¶ 2} Defendant was indicted on January 30, 1986, on one count of rape, a felony in the first degree, in violation of R.C. 2907.02. A jury trial commenced on April 4, 1986. Defendant's first cousin, Rita Warren, age 17, claimed that defendant had raped her after they had left a bar in the early morning hours of December 19, 1985. As part of the rape-kit protocol, a cervical swab was analyzed, and semen was present. A crime analyst from the Ohio Bureau of Criminal Investigation ("BCI") performed blood-grouping tests, which found that

defendant and Warren shared the same blood type, and therefore, defendant could not be eliminated from the population pool of individuals with the same blood type as the offender. Defendant was found guilty of one count of rape and sentenced to seven to 25 years of incarceration. Defendant appealed his conviction to this court in *State v. Wilkins* (Dec. 24, 1986), 9th Dist. No. 12624, 1986 WL 14846, and this court affirmed the judgment.

{¶ 3} On October 28, 2004, defendant filed an application for DNA testing, pursuant to Senate Bill 11. This bill provides certain inmates who are serving a prison term for a felony or under a sentence of death the opportunity to apply for comparison DNA testing if the applicant can demonstrate that his exclusion as the source of biomaterial collected from a crime scene would have been outcome determinative at his trial. The Summit County Court of Common Pleas rejected the application in a journal entry dated December 21, 2004, stating that DNA testing was available, but was not requested, at the time of defendant's 1986 trial and that DNA testing would not have been outcome determinative at the trial due to eyewitness testimony.

{¶ 4} Defendant timely appealed to this court, presenting three assignments of error for our review. For ease of discussion, we will address all of the assignments of error together.

## ASSIGNMENT OF ERROR I

The trial court erred when it denied [Defendant's] application for DNA testing when DNA testing was not generally accepted or admissible at the time of his trial in April, 1986.

## ASSIGNMENT OF ERROR II

The trial court's denial of [Defendant's] application for DNA testing is contrary to law because comparison DNA testing that excludes [Defendant] as the source of the available crime scene biomaterial would be outcome determinative.

## ASSIGNMENT OF ERROR III

The trial court erred by failing to "require the prosecuting attorney to consult with the testing authority and to prepare findings regarding the quantity and quality," the chain of custody, and the reliability of the parent sample of biological material collected from the victim [in compliance with] R.C. 2953.76.

{¶ 5} In his first assignment of error, defendant asserts that the trial court erred in its reasoning, as stated in the journal entry, that DNA testing was

available at the time of defendant's 1986 trial. In his second assignment of error, defendant contends that the trial court's conclusion that his DNA-testing application should be rejected because the results would not be outcome determinative was contrary to law. Defendant's third assignment of error argues that the trial court erred by failing to require the state to prepare specific findings, as required by R.C. 2953.76, before making its decision to accept or reject his DNA-test application. This court notes that all of the above issues are of first impression for us. With that in mind, we agree with defendant's first assignment of error and disagree with the second and third assignments of error.

{¶ 6} We begin by noting that our standard of review as to the legal conclusions of the trial court is de novo. *State v. Rossiter*, 9th Dist. No. 03CA0078, 2004-Ohio-4727, 2004 WL 1969399, at ¶ 5, citing *State v. Russell* (1998), 127 Ohio App.3d 414, 416, 713 N.E.2d 56. This court finds it beneficial to commence our analysis by focusing on defendant's second assignment of error regarding whether or not the results of DNA testing in this case would be outcome determinative.

{¶ 7} The procedure for reviewing and accepting DNA-test applications is set forth in R.C. 2953.71 through 2953.82. After an eligible inmate submits a DNA-test application, R.C. 2953.73(D) states that the trial court "shall make the determination as to whether the application should be accepted or rejected. * * * The court shall make the determination in accordance with the criteria and procedures set forth in [R.C.] 2953.74 to 2953.81." We interpret this to mean that a trial court must read R.C. 2953.74 through 2953.81 sequentially, as a whole. R.C. 2953.73(D) also requires the trial court to consider the application and all corresponding and pertinent files, records, affidavits, documentary evidence, and all materials regarding the proceedings against defendant, "unless the application and the files and records show [that defendant] is not entitled to DNA testing, in which case the application may be denied." Id. Following its determination, the trial court shall enter a judgment and order that accepts or rejects the application. R.C. 2953.73(D) mandates that the trial court shall state the reasons for the acceptance or rejection, based on the criteria and procedures of R.C. 2953.71 to 2953.81, within the judgment and order.

{¶ 8} In its journal entry denying defendant's application for DNA testing, the trial court cites R.C. 2953.73(D) as its support, stating the following reasons for rejecting defendant's application: DNA testing was available at the time of defendant's trial, BCI testing indicated that defendant could not be eliminated as the semen donor, DNA testing would not have been outcome determinative at defendant's trial due to the eyewitness testimony of the victim, and lastly, defendant failed to request DNA testing at the time of the trial. Because R.C. 2953.73(D) states that the trial court must follow R.C. 2953.74 to 2953.81 in order

to reach its decision on whether to accept or reject the application, this court continues to R.C. 2953.74 as the next step in our analysis.

{¶ 9} R.C. 2953.74 governs the grounds for accepting or rejecting the application. R.C. 2953.74(A) states that if an inmate has had a "prior definitive DNA test," the trial court shall reject the inmate's application. If an inmate has previously had an inconclusive DNA test conducted on the same material his application now pertains to, the trial court "shall review the application and has the discretion, on a case-by-case basis, to either accept or reject the application." This section does not define what a "definitive DNA test" is, nor do the definitions found in R.C. 2953.71 reveal whether a blood-grouping test, such as the one performed in defendant's case, qualifies as a "prior definitive DNA test." R.C. 2953.74(A) is also silent as to how to proceed if absolutely no testing has been conducted on an available biological sample. For purposes of this appeal, we will assume that a blood-grouping test is not the equivalent of an "inconclusive DNA test," and will continue our analysis as if no prior DNA test was conducted.

{¶ 10} Proceeding next to R.C. 2953.74(B), this section maintains that if an eligible inmate submits an application under R.C. 2953.73, the trial court may accept the application only if *one* of the following applies:

(1) The inmate did not have a DNA test taken at the trial stage in the case in which the inmate was convicted * * *, the inmate shows that DNA exclusion would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.

(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted * * *, the test was not a prior definitive DNA test that is subject to division (A) of this section, and the inmate shows that DNA exclusion would have been outcome determinative at the trial stage in that case.

As each paragraph of the statute uses the conjunctive, we interpret this section of the statute to mean that a defendant has to meet all of the criteria in either (B)(1) or (B)(2). Defendant's situation is most applicable to (B)(1), and meets some, but not all, of the criteria in this section. Prior to his 1986 trial, defendant had only a blood-grouping test performed. As discussed above, we will assume that this is not a DNA test, and therefore he satisfies this first prong.

{¶ 11} Defendant also satisfies the third prong of the (B)(1) criteria, as results of DNA testing were not generally admissible in evidence or generally accepted. The Ohio Supreme Court did not recognize DNA testing as generally admissible and generally accepted until *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, when the court stated:

[Defendant] has not advanced any argument which would justify the use of a standard for the admissibility of DNA evidence different from that used in determining the admissibility of other scientific or technical evidence. DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible, subject to a judicial analysis for prejudice.

Id. at 497, 597 N.E.2d 107. Therefore, we reject the state's reliance on *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394. In *Apanovitch*, Justice Brown mentions the advancements in and availability of DNA comparison testing in a footnote in his separate opinion concurring in part and dissenting in part; however, nothing is cited regarding the issues of DNA comparison testing being generally accepted or generally admissible.[1]

{¶ 12} Regarding the remaining criteria of (B)(1), this court believes that defendant's arguments fail when examining the second prong of (B)(1), which deals with whether the results of a DNA test would be outcome determinative. R.C. 2953.71(L) defines "outcome determinative" to mean that if the DNA results had been presented at defendant's trial, and if the results were found to be relevant and admissible, then "no reasonable factfinder would have found [defendant] guilty of that offense." After reviewing the record, we agree with the trial court that an exclusion result from DNA testing of the semen taken from the cervical swab would not be outcome determinative of defendant's guilt.

{¶ 13} The physician who treated Warren in the emergency room the next morning testified that Warren had told him she was not sure if defendant had ejaculated during the rape. Defendant's boyfriend at the time of the incident, Vernon Jones, testified that he and the victim had had consensual sexual intercourse "[p]robably about three, four days before" the night that the victim and defendant were out with friends. The time frame is particularly relevant, because the BCI lab technician testified that semen can remain in the vaginal cavity for collection for approximately 72 hours, or even up to four days. Because Vernon Jones could not definitively testify as to whether he and Warren had had consensual sex in the three days prior to the morning of December 19, 1985, it is possible that the semen taken from the cervical swab of Warren could match Vernon Jones. Warren also testified that she could not recall whether she and Vernon Jones had had sex in the three days before December 19, 1985.

{¶ 14} If we consider Warren's uncertainty regarding defendant's ejaculation, plus the testimony from Vernon Jones and Warren that consensual sex between

---

1. In this per curiam decision, Chief Justice Moyer and Justices Holmes and Wright concurred. Justice Douglas concurred in judgment only, while Justices Sweeney, Locher, and Brown concurred in part and dissented in part.

them may have happened in the 72–hour timeframe prior to the rape, this court believes that a DNA test that might exclude defendant as the source of the semen would not be outcome determinative of his innocence. Ejaculation is not a required element of rape, and therefore, even if the semen from the cervical swab did not match defendant, a reasonable factfinder could still come to the conclusion that defendant had raped Warren.

{¶ 15} In *State v. Hightower*, 8th Dist. Nos. 84248 and 84398, 2005-Ohio-3857, 2005 WL 1793522, the Eighth Appellate District also faced the argument that a DNA test would not be conclusive because rape may occur without ejaculation. In resolving this issue, the Eighth District turned to R.C. 2953.74(B), the statute controlling the DNA-test request, to see how central the DNA evidence was to the prosecution's case at the trial court level. The court found that the prosecution in *Hightower* had made the presence of semen central to its case and had singled out the specific evidence of sperm in the vagina and the testimony of another witness, who was not the victim, to corroborate that a rape had occurred as the basis for its prima facie case. The court found:

> To buttress [the witness'] claims, some physical evidence was necessary. Evidence of sperm in the victim's vagina provided that support. A DNA report showing that the sperm was not defendant's, on the other hand, would have left substantial doubt about [the witness'] claims.

Id. at ¶ 27. The Eighth District Court noted that the prior history of the case confirmed that the margin of evidence by which Hightower was convicted was extremely narrow and that a prior jury had been unable to return a verdict on the charges of rape. The court concluded that the scarcity of evidence meant that "no reasonable factfinder would have found the evidence beyond a reasonable doubt that the defendant committed rape, if a DNA test proved the sperm was not defendant's." Id. at ¶ 29.

{¶ 16} We do not find such a narrow margin of evidence in this case, nor do we find that the prosecution made the evidence of DNA on the cervical swab central to its case. While the state did call the physician who performed the rape protocol exam and the BCI lab technician, it also called five other witnesses, including Warren. There were also other physical injuries to Warren, which the emergency room physician testified to, including abrasions on her face and puncture wounds on her right hand, which had already begun to show signs of infection from a human bite. Further trace evidence of pubic hairs, fibers, and other DNA samples were not found, possibly because Warren had showered after the assault. Consequently, we conclude that it was possible that a reasonable factfinder could have found defendant guilty of rape, even if a conclusive DNA test had excluded him as the source of the semen taken from the cervical swab.

{¶ 17} In his third assignment of error, defendant argues that the trial court erred in rejecting his application without requiring the state to prepare a report regarding the quantity and quality of the parent sample, as well as findings on the chain of custody and reliability of the sample, as mandated by R.C. 2953.76. This argument was also raised before the Eighth District in *Hightower*, in which the court reversed the judgment of the trial court and granted the defendant's application, finding that the trial court had not followed R.C. 2953.73(D). The court held that the trial court should have made its determination to accept or reject the application after it had reviewed the prosecutor's report regarding chain of custody and whether a suitable sample existed, in accordance with R.C. 2953.76, and stated that the word "shall" placed a mandatory requirement upon the trial court.

{¶ 18} However, the Eighth District did not conduct an analysis of R.C. 2953.74(B), which we feel is essential in determining whether, and at what point, a trial court erred in rejecting an application. As we discussed above, defendant did not meet the outcome-determinative criteria of R.C. 2953.74(B)(1). In reading 2953.74 to 2953.81 in pari materia, we find that the trial court was not required to proceed further than R.C. 2953.74(B), since defendant did not meet the requirements of B(1) or (2). If a petitioner meets the requirements of R.C. 2953.74(B)(1) or (2), then the trial court would proceed to R.C. 2953.74(C).

{¶ 19} R.C. 2953.74(C) lists six separate factors, and the trial court may accept the application only if *all* six factors apply to the inmate. We believe that it is at this point in the statutory analysis that the trial court should require the prosecuting attorney to consult with the testing authority and prepare a report, under R.C. 2953.76, since it would be impossible for the trial court to consider whether a defendant meets the six factors without the state's report. The second factor of R.C. 2953.74(C) even refers to the state's report, required by R.C. 2953.76, as subsections (a), (b), and (c). We agree with defendant and the Eighth District that it would be procedural error if the trial court arrived at R.C. 2953.74(C) and denied a defendant's DNA application without requiring the state to submit a report under R.C. 2953.76. In this case, however, defendant did not meet the requirements of R.C. 2953.74(B), and, reading the statute as a whole and sequentially, this court feels that a defendant would have to first meet either R.C. 2953.74(B)(1) or (B)(2) before a trial court would consider the six factors under R.C. 2953.74(C).

{¶ 20} Although we agree with the trial court's decision to reject defendant's application because the results would not be outcome determinative, we find that its analysis and reasons for rejecting the application, using R.C. 2953.73(D) as support, were incorrect. DNA testing was available at the time of defendant's trial, but it was not generally admissible or generally accepted at that time. The

Ohio Supreme Court did not recognize DNA testing as generally admissible and generally accepted until *Pierce* was decided in 1992. The fact that the previous DNA test was inconclusive also is not a basis for automatic rejection of defendant's DNA-test application, and the fact that defendant failed to request DNA testing at his trial is irrelevant to his current application.

{¶ 21} Nonetheless, an appellate court shall affirm a trial court's judgment that is legally correct on other grounds, that is, one that achieves the right result for the wrong reason, because such an error is not prejudicial. *Reynolds v. Budzik* (1999), 134 Ohio App.3d 844, at fn. 3, 732 N.E.2d 485, citing *Newcomb v. Dredge* (1957), 105 Ohio App. 417, 424, 6 O.O.2d 178, 152 N.E.2d 801; *State v. Payton* (1997), 124 Ohio App.3d 552, 557, 706 N.E.2d 842. ("It has long been the law in Ohio that ' * * * where the judgment is correct, a reviewing court is not authorized to reverse such judgment merely because erroneous reasons were assigned as the basis thereof.'") *Budzik*, quoting *Agricultural Ins. Co. v. Constantine* (1944), 144 Ohio St. 275, 284, 29 O.O. 426, 58 N.E.2d 658.

{¶ 22} Although we agree with defendant's first assignment of error, we find that defendant did not show that DNA testing of the cervical swab would be outcome determinative, and thus defendant's second assignment of error is overruled. We also overrule defendant's third assignment of error, and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

CARR and MOORE, JJ., concur.